**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Sam C. MARTINO, Joseph C. Russello and Rolando Gonzalez Rodriguez, Defendants-Appellants.**

**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**John Alan HOLT, Rosario Palermo, William H. Brown, a/k/a Bill, John D. Fisher, Robert D. Young, Joseph Macaluso, a/k/a Joe, Frank Scionti, John Nicholas Lostracco, Sam C. Martino, Paul Guarino, Jimmy Farina, Berton B. Chase, a/k/a Bert, Rolando Gonzalez Rodriguez, a/k/a Roland Rodriguez, Joseph D. Lazzara, a/k/a Joe, Joseph C. Russello, a/k/a Joe and Amalia Morgado, Defendants-Appellants.**

**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Sam C. MARTINO, Defendant-Appellant.**

**Nos. 78-3611, 78-5260 and 79-2606.**

United States Court of Appeals,
Fifth Circuit.

June 19, 1981.

Rehearing Denied in Nos. 78-5260 and 79-2606 Sept. 17, 1981.

Rehearing En Banc Granted in No. 78-3611 Oct. 13, 1981.

368

Sam D. Pendino (Court-appointed), Tampa, Fla., for Scionti.

Gary R. Trombley, Claude H. Tison, Jr., Tampa, Fla., for Martino.

William T. Fussell, Tampa, Fla., for Guarino.

William B. Plowman, Tampa, Fla., for Farina.

Mark J. Kadish, Edward T. M. Garland, Atlanta, Ga., for Chase.

Barry A. Cohen, Richard Pippinger, Tampa, Fla., for Lazzara.

Michael Addison (Court-appointed), Tampa, Fla., for Morgado.

Before TUTTLE, VANCE and POLITZ, Circuit Judges.

POLITZ, Circuit Judge:

In the decade following enactment of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961 *et seq.*, prosecutions under that Act have begun to follow the recognizable patterns we noted in *United States v. Malatesta*, 583 F.2d 748 (5th Cir. 1978), *aff'd on reh. on other grounds*, 590 F.2d 1379 (5th Cir.) (en banc), *cert. denied*, 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777 (1979). The cases are characterized by lengthy indictments involving multiple defendants charged with diverse criminal activity. In the style of that embryonic tradition this appeal presents sixteen defendants with a combined total of eighty convictions.

The prosecutions we review were commenced by an eighty-three page, thirty-five count indictment, charging twenty-three defendants with mail fraud, RICO conspiracy and RICO substantive violations, specifying sixty-nine overt acts and fifty-six predicate acts of racketeering activity. Three defendants entered guilty pleas. The remaining twenty were jointly tried before a jury in a trial spanning three months. After deliberating three and one-half weeks, the jury found four defendants not guilty and sixteen defendants guilty of one

D. Frank Winkles, Tampa, Fla., for Martino and Lostracco.

Raymond E. LaPorte, Tampa, Fla., for Russello.

Peter N. Macaluso, Tampa, Fla., for Rodriguez.

Gary L. Betz, U.S. Atty., Jacksonville, Fla., Eleanor J. Hill, Sp. Atty., Dept. of Justice, Tampa, Fla., Sara Criscitelli, Dept. of Justice, Washington, D.C., for U.S.

Roland A. Rosello (Court-appointed), Tampa, Fla., for Holt.

C. Steven Yerrid (Court-appointed), Tampa, Fla., for Palermo.

Arthur W. Fisher, III (Court-appointed), Tampa, Fla., for Fisher.

Guy E. Labalme (Court-appointed), Tampa, Fla., for Young.

Daniel J. Newman (Court-appointed), Tampa, Fla., for Macaluso.

or more counts; all appeal.[1] The supplemented record on appeal includes 8 volumes of pleadings, nearly 100 volumes containing more than 11,000 pages of the testimony of over 200 witnesses, and 5 boxes of exhibits.

The indictment resulted from an investigation of a large number of suspected acts of arson occurring in Tampa and Miami, Florida between July 1973 and April 1976. The indictment charges that a group composed of an insurance adjuster, homeowners, promoters, investors and arsonists associated for the purpose of committing arson with the intent to defraud fire insurers. This association of individuals is characterized as an "enterprise," thus bringing the offenses within the purview of RICO, 18 U.S.C. § 1962.[2] Count 1, of which the sixteen defendants were convicted, charges a conspiracy to violate RICO, § 1962(d). Count 2, of which fifteen defendants were convicted, charges a substantive violation of RICO, § 1962(c). Counts 3 through 35

charge various defendants with violations of the mail fraud statute, 18 U.S.C. § 1341,[3] and aiding and abetting, 18 U.S.C. § 2,[4] arising out of the filing of insurance claims and receipt of payments for the losses resulting from the arsons.

Several issues are presented on appeal; some are common to all appellants, some to more than one, and some apply to only a particular appellant. Each appellant has filed a brief in which the arguments advanced by all other appellants are adopted. We shall, in general, address the common issues first and then review those issues pertinent to only a single appellant.

### I. *The Setting—The Cast*

A summarization of the facts concerning each of the fifteen fires and subsequent insurance claims is set forth in the Appendix. We discuss these facts in somewhat greater detail during consideration of various contentions of insufficient evidence to

---

1. The following concurrent sentences were imposed: GUARINO—Counts 1 & 2: 12 years per count, Counts 3–10, 14–20: 5 years per count; SCIONTI—Counts 1 & 2: 12 years per count, Counts 3–6: 5 years per count; FARINA—Counts 1 & 2: 8 years per count, Counts 9 & 10: 5 years per count; LOSTRACCO—Counts 1 & 2: 9 years per count, Counts 17 & 18: 5 years per count; MARTINO—Counts 1 & 2: 10 years per count, Counts 14, 15 & 16: 5 years per count; MORGADO—Counts 1 & 2: 9 years per count, Counts 21 & 22: 5 years per count; MACALUSO—Counts 1 & 2: 9 years per count, Counts 7, 8, 11, 12 & 13: 5 years per count; LAZZARA—Counts 1 & 2: 10 years per count, Counts 5 & 6: 5 years per count; RODRIGUEZ—Counts 1 & 2: 8 years per count, Counts 7 & 8: 5 years per count; RUSSELLO—Counts 1 & 2: 10 years per count, Counts 28 & 29: 5 years per count; CHASE—Count 1: 6 years; PALERMO—Counts 1 & 2: 8 years per count, Counts 3 & 4: 5 years per count; BROWN—Counts 1 & 2: 8 years per count, Counts 30 & 31: 5 years per count; FISHER—Counts 1 & 2: 8 years per count, Counts 32 & 33: 5 years per count; YOUNG—Counts 1 & 2: 8 years per count, Counts 32 & 33: 5 years per count; HOLT—Counts 1 & 2: 9 years per count, Counts 21 & 22: 5 years per count (Youth Corrections Act).

2. 18 U.S.C. § 1962 provides in part:
 (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .
 (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.

3. 18 U.S.C. § 1341 provides in pertinent part:
 Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon . . . shall be fined not more than $1,000 or imprisoned not more than five years, or both.

4. 18 U.S.C. § 2 provides:
 (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
 (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

support the convictions. An overview of the charged conspiracy and enterprise, however, facilitates an understanding of the application of RICO, particularly because, the degree of involvement varied with each defendant.

The arson ring began operating in 1973 when Paul Guarino and Frank Scionti hired Willie Noriega as their principal "torch." At first the arsonists only burned buildings already owned by those associated with the ring. Following a burning, the building owner filed an inflated proof of loss statement and collected the insurance proceeds from which his co-conspirators were paid. Later, ring members bought buildings suitable for burning, secured insurance in excess of value and, after a burning, made claims for the loss and divided the proceeds.

Different roles were played by those defendants comprising the enterprise. Joseph J. Carter was the insurance adjuster who, with knowledge of the arson, processed fire loss claims. In return for this service and for guiding others to insurance agencies where fire insurance could be secured in excess of the value of substandard property, Carter received a portion of the insurance proceeds. He pled guilty to nineteen counts and testified as a government witness.

Willie Noriega, the primary arsonist, pled guilty to all 35 counts and testified as the key government witness. Noriega was assisted in the "torching" by Paul Guarino, Frank Scionti, Joseph Macaluso and Victor Arrigo, who also testified as a government witness after pleading guilty to seven counts.

Sam C. Martino and Berton B. Chase provided financing for some of those who bought property targeted to be burned. Martino was in the real estate business and, in addition to arranging loans, located substandard property for use in the scheme. The defendants who acquired or aided in the acquisition of targeted property, secured excessive insurance and collected insurance payments included Carter, Guarino, Martino, Noriega, Macaluso, Amalia Morgado, John D. Fisher and Robert D. Young.

Several defendants already owned premises, mostly substandard, covered by fire insurance. They needed only the services of the arsonists and, in some instances, claims assistance. This group included Jimmy Farina, Joseph D. Lazzara, Rolando Gonzalez Rodriguez, Joseph C. Russello, John Alan Holt, Rosario Palermo and William H. Brown.

Finally, there were those who served as the contacts or go-betweens for persons who owned property they wished to have burned, or who wanted to acquire property for that purpose, and the arsonists. These "marketers" or "brokers" included Carter, Guarino, Scionti, Morgado, Martino and John Nicholas Lostracco.

With the basic structure of the "enterprise" and the roles of the various defendants in perspective, we now consider the assignments of error.

### A. Constitutionality of RICO

The RICO statute is challenged on five grounds that, in the main, have been considered and dismissed in earlier cases. It is contended that RICO (1) punishes associational status, (2) does not apply to enterprises engaged solely in criminal activity, (3) is unconstitutionally vague, (4) operates *ex post facto*, and (5) is contrary to the Ninth and Tenth Amendments.

In *United States v. Elliott*, 571 F.2d 880 (5th Cir.), *cert. denied*, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978), we rejected the argument that RICO unconstitutionally punishes associational status; "its proscriptions are directed against conduct, not status." *Id.* at 903. Also in *Elliott*, and recently reaffirmed in *United States v. Diecidue*, 603 F.2d 535 (5th Cir. 1979), *cert. denied*, 445 U.S. 946, 446 U.S. 912, 100 S.Ct. 1345, 100 S.Ct. 1842, 63 L.Ed.2d 781, 64 L.Ed.2d 266 (1980), we held RICO applicable to a group whose sole purpose was to engage in illegal activities. Appellants request a reconsideration of that position in light of contrary opinions from other circuits.[5] We are aware of the criticisms lev-

---

5. *See, e. g., United States v. Turkette*, 632 F.2d 896 (1st Cir. 1980), *cert. granted*, —— U.S. ——, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981);

*United States v. Anderson*, 626 F.2d 1358 (8th Cir. 1980).

eled at our decisions and we recognize that appellants' position is arguably meritorious. What appellants request, however, is not a course available to this panel but is a prerogative only of our court sitting *en banc*.

■ Appellants' third contention, that RICO is unconstitutionally vague, was rejected in *United States v. Hawes*, 529 F.2d 472, 479 (5th Cir. 1976), in which we held that a person of average intelligence, upon reading the statute with the aid of relevant definitional provisions, "could not help but realize that they would be criminally liable for participating in 'any enterprise,' including their own, 'through a pattern of racketeering activity.' "

■ Whether RICO is unconstitutional as an *ex post facto* law because of judicial enlargement is a question never before considered by us. The defendants argue that by applying RICO to illegitimate as well as legitimate enterprises, we have deviated so far from an average person's understanding of RICO that an *ex post facto* effect results. It is not every judicial expansion of statutory construction that creates an *ex post facto* law; rather, it is only those which are "unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue." *Bouie v. City of Columbia*, 378 U.S. 347, 354, 84 S.Ct. 1697, 1703, 12 L.Ed.2d 894 (1964), *quoting* Hall, *General Principles of Criminal Law* at 61 (2d ed.1960).

■ "Enterprise" is defined in § 1961 to include "any . . . group of individuals associated in fact although not a legal entity." This language is broad and non-restrictive. It is not unreasonable to suggest that this language encompasses groups associated for the purpose of committing arson with the intent to defraud. This general, non-specific language negates the contention that expansive judicial interpretation is either unexpected or indefensible. We do not find that the interpretation given to RICO by this court has so deviated from what would

be an average person's understanding that an *ex post facto* effect has occurred. This contention of constitutional abrogation is infirm.

■ We likewise reject the proposition that RICO violates the Ninth and Tenth Amendments. Appellants assert that RICO intrudes upon state sovereignty because the statute fails to require that the acts of racketeering *per se* affect interstate commerce. This argument ignores the essence of RICO which proscribes the furthering of the enterprise, not the predicate acts. The predicate acts are, in turn, proscribed by existing, enumerated state or federal laws. *United States v. Bright*, 630 F.2d 804 (5th Cir. 1980). Appellants were not convicted of the state offense of arson; they were all (except Chase) convicted of the federal offenses of mail fraud and of conspiring to participate and participating in the affairs of an enterprise affecting interstate commerce.

We conclude and hold that the five grounds upon which appellants challenge the constitutionality of RICO are without merit.

### B. *The Indictment*

■ The indictment is challenged on several grounds, including insufficiency, duplicity and misapplication of RICO. It is also contended that there is a variance between the indictment and the evidence. First, it is argued that the required effect of interstate commerce is not sufficiently alleged. Like the indictment in *Diecidue, supra*, the instant indictment tracks the language of the statute as to the effect on interstate commerce. The indictment further charges that the defendants "did knowingly and willfully place and cause to be placed . . . in authorized depositories for mail matter to be sent and delivered according to the directions thereon by the Postal Service of the United States." The effect on interstate commerce is sufficiently alleged.

■ Appellants contend that Count 1 charges multiple conspiracies and therefore the indictment is duplicitous. Appellants insist that each fire listed constitutes a separate conspiracy. To the contrary, "[t]he allegations addressed to the various substantive offenses committed as part of the conspiracy are merely descriptive of the single overall agreement." *Diecidue,* 603 F.2d at 546. The count is not duplicitous; it charges a single conspiracy involving several acts.

■ It is next contended that the indictment is fatally defective because the appellants are charged under the wrong subsection of § 1962. It is argued that inasmuch as they are charged with associating with the other defendants, as the enterprise involved, they were mistakenly charged with violating subsection (c), rather than (b). This argument founders on the shoals of the language of RICO. Subsection (b) proscribes acquiring or maintaining an interest or control in an enterprise through a pattern of racketeering activity; subsection (c) makes it unlawful for one associated with or employed by the enterprise to participate in the conduct of its affairs through a pattern of racketeering activity. Appellants insist that § 1962(c) applies only to those who manage the enterprise, *i. e.,* the top coterie. We disagree. Section 1962(c) makes it unlawful to "conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs." The word "conduct" is neither illusive nor mysterious, nor is its use unique to RICO. It is found in other statutes including, *inter alia,* 18 U.S.C. § 1955 which makes it a crime for one to conduct an illegal gambling business. In *United States v. Tucker,* 638 F.2d 1292 (5th Cir. 1981), we held that a waitress serving drinks to customers engaged in gambling conducts an illegal gambling business within the intendment of 18 U.S.C. § 1955. We concluded in *Tucker* that the word "conducts" simply means the performance of activities necessary or helpful to the operation of the enterprise.

■ Finally, appellants cite *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), attacking the indictment on the ground that it alleges only one conspiracy while the government's evidence establishes multiple conspiracies. They contend that this results in a variance that substantially prejudiced their rights contrary to *Kotteakos.* We disagree. This argument has been considered in *Elliott, Diecidue,* and *Bright, supra,* and in *United States v. L'Hoste,* 609 F.2d 796 (5th Cir.), *cert. denied,* —— U.S. ——, 101 S.Ct. 104, 66 L.Ed.2d 39 (1980). In *L'Hoste* we resolved this issue adverse to the appellants, stating: "If the Government proves multiple conspiracies and a defendant's involvement in at least one of them, then clearly there is no variance affecting that defendant's substantial rights." 609 F.2d at 801, *citing United States v. Wayman,* 510 F.2d 1020 (5th Cir.), *cert. denied,* 423 U.S. 846, 96 S.Ct. 84, 46 L.Ed.2d 67 (1975). Following the path of *L'Hoste,* we find no variance affecting the appellants' substantial rights.

We find no merit in any of appellants' challenges to the indictment.

### C. *Double Jeopardy*

■ Appellants submit that the government should have been forced to elect between Counts 1 and 2 because prosecution on both does violence to the double jeopardy clause which "protects against multiple punishments for the same offense." *United States v. Smith,* 574 F.2d 308, 309 (5th Cir.), *cert. denied,* 439 U.S. 931, 99 S.Ct. 321, 58 L.Ed.2d 325 (1978), *quoting North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969). The "same offense" test may be simply stated: If there is any difference in the elements to be proven, the two instances are not the same offense. *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). Application of the rubric to RICO violations requires pause and reflection because of the nature of the RICO statute. We bear in mind that under *Blockburger* we must determine if one offense requires proof of a fact not required by the other.

■ Prosecution of RICO substantive and conspiracy charges expectedly involves

considerable overlap in the evidence, especially where the enterprise exists as a consequence of persons associating and committing acts making up a pattern of racketeering activity. Such overlap does not occasion an automatic invocation of double jeopardy. *Iannelli v. United States*, 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975).

■ A RICO substantive charge requires proof of the existence of an enterprise which affects interstate commerce and that the defendant participated in the conduct of the enterprise's affairs by committing at least two of the designated acts of racketeering activity. A RICO conspiracy charge requires the additional element of agreement; the defendant must have "objectively manifested an agreement to participate, directly or indirectly, in the affairs of an enterprise *through the commission of two or more predicate crimes.*" *Elliott*, 571 F.2d at 903 (emphasis in original). The *Elliott* court also stated that the agreement involved in a RICO conspiracy must include the vital element of agreeing to commit the predicate acts. Upon proof of the commission of racketeering activity, "the inference of an agreement to do so is unmistakable." *Id.* This statement has been interpreted to cast a shadow across the sun because it leads to the argument that the distinguishing element of subsection (d) (the agreement to violate) evaporates because proof of the substantive charge automatically includes proof of a conspiracy. *United States v. Anderson*, 626 F.2d 1358, 1368–69 n. 18 (8th Cir. 1980); Note, *Racketeers, Congress and the Courts: An Analysis of RICO*, 65 *Iowa L.Rev.* 837, 879 (1980). If the only evidence offered from which a jury can infer an agreement to participate in the enterprise is evidence of engaging in a pattern of racketeering activity, the requisites for applying the double jeopardy rule would appear to exist.

■ Albeit persuasive, this argument glosses over the essential teaching of *Blockburger* and obfuscates the inquiry whether the two counts charge the same offense. The aegis of the double jeopardy clause of the Fifth Amendment is not invoked merely by showing that a jury had the opportunity to convict on two counts by drawing appropriate inferences from the same evidence. "[T]he *Blockburger* test looks *not* to the evidence adduced at trial but focuses on the elements of the offense charged." *United States v. Cowart*, 595 F.2d 1023, 1029 (5th Cir. 1979). That the distinguishing element can be proven by the same evidence as that used to convict on another count does not bring the offenses within the context of double jeopardy. *United States v. Dunbar*, 591 F.2d 1190 (5th Cir. 1979), *aff'd on reh. on other grounds*, 611 F.2d 985 (5th Cir. 1980) (en banc). The RICO substantive and RICO conspiracy convictions are not vitiated by the double jeopardy clause.

## D. *Pre-trial Matters*

Appellants request our review of certain pre-trial matters they contend constitute reversible error. These include motions for bill of particulars, requests for *Brady* material and the medical examination into Willie Noriega's competence to testify.

■ It is argued that because of the complexity of the case, the motions for bill of particulars should have been granted to prevent confusion which hindered the defendants from understanding the nature of the charges against them. Action on a motion for bill of particulars is committed to the sound discretion of the trial judge. We may reverse a ruling denying the motion only if a defendant demonstrates that he was "actually surprised at trial and thus incurred prejudice to his substantial rights by the denial." *Diecidue*, 603 F.2d at 563. No such demonstration has been made to this court; there has been no abuse of discretion and no reversible error exists.

Appellants contend that the government failed to comply with the disclosure requirements of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny. They specifically call our attention to inconsistent statements made prior to and during trial by a government witness and a letter sent to the U.S. Attorney by a

psychiatric expert for the government. The alleged inconsistent statements were made by a witness with respect to a 1972 fire in which two arsonists died.[6] In her first statement to the police shortly after the fire, the witness said that Robert Bradwell (one of the arsonists who died) had told her that he had been robbed and set on fire by unknown persons. At trial, she testified that Bradwell had asked her to make that statement, but that he also told her what really happened: he had been burned while he, Lester Oates and Paul Guarino set fire to the Kakeland Bakery.

■ As impeaching evidence, the prior inconsistent statement would fall within disclosure requirements because *Brady* encompasses impeachment evidence as well as evidence favorable to the accused on the issue of guilt. *United States v. Auten*, 632 F.2d 478 (5th Cir. 1980). Failure of the government to disclose information useful only for impeachment, however, mandates reversal only if defendants demonstrate that the undisclosed evidence probably would have resulted in acquittal. *United States v. Anderson*, 574 F.2d 1347 (5th Cir. 1978). It cannot be seriously contended that this one statement made by one of the more than one hundred government witnesses would probably have resulted in acquittal. The claim is devoid of merit.

■ The remaining asserted *Brady* violation concerns a letter written to the U.S. Attorney by the psychiatrist who served as the government's witness on rebuttal. In the letter the psychiatrist opined that Willie Noriega was not psychotic in 1963 but that he had self-induced psychotic symptoms by using drugs in an attempt to avoid prosecution for arson. The letter was given to the defendants after the doctor testified, consistent with the requirements of the Jencks Act, 18 U.S.C. § 3500. This disclosure expunged any earlier error because "when alleged *Brady* material is contained in Jencks Act material, disclosure is generally timely if the government com-

plies with the Jencks Act." *Anderson*, 574 F.2d at 1352. This *Brady* claim is also without merit.

Pursuant to a defense request prior to trial, the trial court exercised its discretion and appointed an expert to conduct a competency examination of Noriega. *See United States v. Roach*, 590 F.2d 181 (5th Cir. 1979); *United States v. Jackson*, 576 F.2d 46 (5th Cir. 1978). The psychiatrist was instructed to examine Noriega and formulate an opinion about his present mental state and whether he was then able to differentiate reality from fantasy and accurately to remember and relate events that occurred during the prior five years. The expert determined Noriega was competent to testify at trial. Appellants insist the court erred in not requiring the psychiatrist also to determine Noriega's mental condition during the time period of the alleged offenses.

■ Whether a witness is competent to testify is a threshold question of law to be answered by the judge. *Roach, supra*; Wharton's Criminal Evidence, Vol. 11 § 377 (13th ed. C. Torcia 1972). It is left to the jury to assess a witness's credibility and the weight to be accorded his testimony. Because a witness's mental state during the period about which he proposes to testify is a matter which affects his credibility, it is a jury determination and thus not germane to competency to testify. We posted this trail in *United States v. Partin*, 493 F.2d 750, 762 (5th Cir. 1974), *cert. denied*, 434 U.S. 903, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977):

The readily apparent principle is that the jury should, within reason, be informed of all the matters affecting a witness's credibility to aid in their determination of the truth .... It is just as reasonable that a jury be informed of a witness's mental incapacity at a time about which he proposes to testify as it would be for the jury to know that he then suffered an impairment of sight or

---

**6.** This fire was not the subject of a mail fraud count, but was named as an overt act in Count 1.

hearing. It all goes to the ability to comprehend, know, and correctly relate the truth.

*See also Greene v. Wainwright*, 634 F.2d 272 (5th Cir. 1981).

In the case at bar the trial judge was not obligated to ask the court-appointed expert to determine Noriega's mental capacity at the time of the alleged offenses as well as his competence to testify. It would not have been error had the trial judge done so, for this would have been an additional item of evidence for the jury to consider in making its credibility assessment. Nevertheless, to decline to grant this defense request does not constitute reversible error. The defendants had ample opportunity to show Noriega's mental condition at the time about which he testified. Defense experts testified, as did acquaintances of Noriega who knew him during the arson spree. Furthermore, the jury was properly instructed to consider evidence of a witness's mental condition at the time of the incidents in judging the credibility of the witness and the weight to be given to that witness's testimony.

### E. *Joint Trial versus Severance*

Each appellant alleges prejudice by the joinder of his trial with the other defendants and that the trial judge committed reversible error in failing to grant the repeated motions for severance. Joinder was proper under Rule 8(b), Fed.R.Crim.P. *See Bright, supra.* Accordingly, defendants must rely on Rule 14, Fed.R.Crim.P., which permits severance if a defendant is prejudiced by the joinder.[7] On a Rule 14 severance motion, the trial judge is required to weigh the prejudice inherent in a joint trial in light of the realities of judicial economy and to sever defendants as the needs of justice dictate. *United States v. McLaurin*, 557 F.2d 1064 (5th Cir. 1977), *cert. denied*, 434 U.S. 1020, 98 S.Ct. 743, 54 L.Ed.2d 767 (1978). The denial of a motion to sever is reversible only for abuse of discretion. An appellant's burden of showing prejudice is onerous; the general test is:

> whether under all the circumstances of the particular case, as a practical matter, it is within the capacity of the jurors to follow the court's admonitory instructions and accordingly to collate and appraise the independent evidence against each defendant solely upon that defendant's own acts, statements and conduct. In sum, can the jury keep separate the evidence that is relevant to each defendant and render a fair and impartial verdict as to him? If so, though the task be difficult, severance should not be granted.

*Peterson v. United States*, 344 F.2d 419, 422 (5th Cir. 1965).

To buttress their claim of prejudice, appellants submit an impressive litany: there were twenty defendants, most with Spanish or Italian surnames; thirty-five counts (only thirty-three remained after Noriega pled guilty) were charged, but many of the defendants were charged in only a few of the counts; the trial lasted three months; the jury heard over 200 witnesses, some testifying against many defendants, others testifying against only a few; and there were nineteen defense counsel and three prosecuting attorneys, all within the confines of a modest sized courtroom. Appellants argue that the totality of these facts created a "circus" atmosphere rather than that which should prevail for a serious criminal trial.

We are keenly aware that joint trials, especially those involving numerous defendants and multiple charges, carry substantial risks of manifest unfairness. We do not encourage trials en masse. We must, however, reckon with the realities of this type prosecution. The Constitution does not guarantee a trial free from the burdens that inevitably accompany such a trial; rather, it requires that the potential for transferability of guilt be minimized to

---

**7.** Rule 14, Fed.R.Crim.P., provides in pertinent part:

> If it appears that a defendant ... is prejudiced by a joinder of offenses or of defendants in an indictment ... or by such joinder for trial together, the court may ... grant a severance of defendants.

the extent possible in order to "individualize each defendant in his relation to the mass." *Kotteakos, supra; United States v. LeCompte*, 599 F.2d 81 (5th Cir. 1979), *cert. denied*, 445 U.S. 927, 100 S.Ct. 1313, 63 L.Ed.2d 759 (1980); *Elliott, supra.* We recently confronted this same issue in *United States v. Morrow*, 537 F.2d 120, 136 (5th Cir. 1976), *cert. denied*, 430 U.S. 956, 97 S.Ct. 1602, 51 L.Ed.2d 806 (1977), and our discussion relative to severance is appropriate here:

> In reviewing a claim of undue complexity and confusion, an appellate court looks to the totality of the circumstances in striking a balance between the interest in judicial economy and the need to protect the rights of the individual defendant. A joint trial of twenty-three defendants, charged with conspiracy and numerous substantive counts, clearly raised the possibility that the jury might cumulate the evidence introduced by the Government on all counts and against all defendants to find guilty a defendant whose connection with the conspiracy was at best marginal. The pernicious effect of cumulation, however, is best avoided by precise instructions to the jury on the admissibility and proper uses of the evidence introduced by the Government. The remedy of severance is justified only if the prejudice flowing from a joint trial is clearly beyond the curative powers of a cautionary instruction. Where the Government charges a single conspiracy, as it did here, much of the evidence introduced ultimately bears, at least indirectly, on the agreement of the co-conspirators. Once the Government has satisfactorily established the existence of the conspiracy, the same evidence used to convict a particular defendant is admissible against all co-defendants shown to be members of the conspiracy. Given this state of affairs, the interest in judicial economy understandably exerts strong pressures in favor of a joint trial.

In the case *sub judice* Judge Hodges faced a formidable task. He conducted the trial with great skill and with a judicial professionalism much to be admired. He minimized the potential transference of guilt with every tool at his command. He gave careful, detailed instructions about the elements of RICO conspiracy and RICO substantive charges, doing so, as appropriate, as they related to each defendant. Proper uses of evidence were explained. Judge Hodges met the burden of avoiding the "pernicious effect of cumulation."

■ Notwithstanding the very skillful presiding of the trial judge, appellants argue 'that the totality of the circumstances were such that a jury had to be confused and unable to individualize the verdicts simply because of the volume of evidence which inundated them. We acknowledge the validity of this concern and, were it not for the manner in which Judge Hodges handled this obviously difficult trial and our review of the verdicts in light of the record, we might be prone to agree with appellants. We finally resolve this contention by "look[ing] to the verdict. Convictions will invariably be sustained if it may be inferred from the verdict that the jury 'meticulously sifted the evidence' as where it acquits on certain counts." *Tillman v. United States*, 406 F.2d 930, 936 (5th Cir.), *vacated in part on other grounds*, 395 U.S. 830, 89 S.Ct. 2143, 23 L.Ed.2d 742 (1969), *quoting* 8 Moore, *Federal Practice* ¶ 14.04[1], at 14–15 (2d ed. 1968). It is apparent from the verdicts reached that the jury, after more than three weeks of deliberation, did "meticulously sift" the evidence. Four defendants were acquitted on all charges; eight others were convicted on some charges but acquitted on others. Although coming close, defendants have not met the burden imposed to compel our finding of an abuse of discretion.[8]

---

**8.** We are mindful of our recent decision in *United States v. Diaz-Munoz*, 632 F.2d 1330 (5th Cir. 1980), where we found that the jury had not been able to evaluate each defendant's position properly. That case is not controlling.

In *Diaz-Munoz* we found that misjoinder had occurred; in the case at bar joinder was proper. Furthermore, in *Diaz-Munoz* the jury deliberated for less than three hours (including

## F. *Trial Errors*

Appellants allege reversible error because of prosecutorial misconduct, misconduct of defense counsel and various other trial errors. They maintain that whereas the alleged errors singularly might not be sufficient to mandate reversals, their cumulative effect denied appellants a fair trial, warranting reversals of the convictions. After examining each error assigned, we are compelled to disagree.

### 1. Jencks Act

Appellants condemn the manner in which the government conducted interviews with its witnesses ostensibly to avoid producing Jencks Act material under 18 U.S.C. § 3500,[9] calling it "the most abusive conduct by the government." It became evident during trial that government attorneys and FBI agents held several interviews with potential witnesses but no written or recorded statements were taken. Appellants argue that the government purposely failed to record the interviews because they wanted to hinder the defense and that such tactics by the prosecution should not be tolerated.

No requirement has been brought to our attention that all interviews must be recorded or that interview notes must be reduced to writing and signed or otherwise approved by the witness. We cannot presume that the prosecutor acted in bad faith by failing to reduce his notes to statement form. That interviewers usually take notes rather than verbatim statements was noted by Justice Powell in his concurrence in *Goldberg v. United States*, 425 U.S. 94, 122 n.9, 96 S.Ct. 1338, 1345 n.9, 47 L.Ed.2d 603 (1976), wherein he stated:

Indeed, only the foolish or exceptionally talented counsel will depend solely on his memory when preparing for the examination of a key witness. But the fact that counsel usually will take notes does not mean that the notes often will be "statements." Counsel rarely take down verbatim what witnesses say in these preparatory conferences. Consequently, prosecutors' notes. may be expected to meet the requirements of [18 U.S.C. § 3500](e)(2) very infrequently. (Citations omitted.) The notes taken will vary from cryptic "memory jogs" to full summaries of the anticipated testimony.

Appellants' claim of error on this issue is without merit.

### 2. Opening Statements

Comments made during opening statements by two of the twenty-two lawyers involved in this trial have been singled out and categorized as highly prejudicial and sufficient to warrant reversal. One statement is attributed to the prosecutor who informed the jury that Noriega and his family had been relocated to a different part of the country as a result of his cooperation with the government and that Noriega had received approximately $34,000 from the government. Defendants contend this was an improper reference to the federal Witness Protection Program and was a suggestion to the jury that the defendants were a source of danger to Noriega.

Reference to a witness's participation in the Witness Protection Program was also at issue in the appeal after remand in *United States v. Partin*, 552 F.2d 621 (5th Cir.), cert. denied, 434 U.S. 903, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977). In *Partin* we recognized that disclosure of such participation is

---

lunch); in the case we review the jury deliberated over three weeks.

**9.** Under the Jencks Act, the government is required to produce any statement of a witness, after that witness testifies and upon motion of the defendant, that is in the possession of the United States and relates to the subject matter to which the witness testifies. "Statement," within the context of this Act, means one that is written, transcribed, or stenographically, mechanically or electronically recorded and is a

substantially verbatim recital of an oral statement made by the witness and recorded contemporaneously with the making of such oral statement. It is undisputed that notes taken by an interviewer during an interview with the witness do not qualify as a statement under the Jencks Act. *United States v. Cuesta*, 597 F.2d 903 (5th Cir. 1979); *United States v. Scaglione*, 446 F.2d 182 (5th Cir.), cert. denied, 404 U.S. 941, 92 S.Ct. 284, 30 L.Ed.2d 254 (1971).

a delicate matter because the jury might infer that the defendant is a threat to the witness or his family. We made clear that the prosecution may not exploit the possibility of such an inference. At the same time, however, we recognized that the defendant should be permitted to show that a witness, while in the program, received substantial benefits. Such information is relevant in the ultimate determination of the witness's credibility.

Anticipating that Noriega's receipt of benefits from the government would be used to impeach his credibility, the prosecutor chose to inform the jury of this in his opening statement. This information is admissible and we cannot say that the prosecutor's brief comment at the beginning of trial was an unfair exploitation.[10]

The remaining comment during opening statements to which defendants assign error was made by counsel for co-defendant Lostracco who commented that his client, presented as entirely innocent of the charges brought against him, was forced as a result of the indictment to sit down with a "bunch of gangsters." Defendants argue that this comment was highly prejudicial, especially in light of the surnames of most of the defendants. While we do not condone such tactics or language by any counsel in any stage of a trial, we are not persuaded that it was so prejudicial as to mandate reversals. The statement in question was made at the beginning of a lengthy trial and was not repeated. After viewing the entire record, we are not convinced that the improper statement influ-

enced the jury at all. We find the error harmless.

### 3. Defense Counsel's Comment on His Client's Decision to Testify

Counsel for Lostracco is the subject of another assignment of error. In closing argument, he made repeated references to Lostracco's testimony, emphasizing that his client had chosen to testify. The other defendants contend that this was an improper reference to their decisions not to testify, thus causing reversible error. This argument was raised and rejected in *Diecidue, supra*, wherein we noted that while references to an accused's silence is reversible error, "mere favorable observation on the willingness of one of several co-defendants to testify" is not reversible error. 603 F.2d at 553. This assignment is without merit.

### 4. Assertion of Fifth Amendment Privilege

Another argument raised by appellants was similarly rejected in *Diecidue*, a case in which Willie Noriega also testified as a government witness. In both trials, Noriega chose to exercise his Fifth Amendment right against self-incrimination. In both appeals the defendants have argued that Noriega's decision to exercise his Fifth Amendment right denied them the right of confrontation. The questions which prompted assertion of the Fifth Amendment privilege were almost identical in both proceedings. In *Diecidue* we noted that where a witness legitimately invokes the privilege, the testimony is to be struck only if the defendants' resultant inability to

---

**10.** Defendants also complain about various comments made by the prosecutor during closing argument. Specifically, they point to remarks about "defense lawyer tactics," the "millionaire defense," the individual victims of the arsons, and his response to defendant Chase's argument by saying "the government's evidence has been truthful." We do not find that such comments meet the test for a new trial as again recently stated in *United States v. Lichenstein*, 610 F.2d 1272, 1281 (5th Cir.), *cert. denied*, 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 856 (1980), *quoting United States v. Blevins*, 555 F.2d 1236, 1240 (5th Cir. 1977), *cert. de-

nied*, 434 U.S. 1016, 98 S.Ct. 733, 54 L.Ed.2d 761 (1978): "[p]rosecutorial misconduct in the form of improper comments ... 'must be so pronounced and persistent that it permeates the entire atmosphere of the trial.'" Furthermore, the prosecutor's comment on rebuttal that his evidence was "truthful" was proper because "[t]he prosecutor ... may even present what amounts to a bolstering argument if it is specifically done in rebuttal to assertions made by defense counsel in order to remove any stigma cast upon him or his witnesses." *United States v. Dorr*, 636 F.2d 117, 120 (5th Cir. 1981).

complete their questioning creates a substantial risk of prejudice. Generally, it is only when a witness refuses to answer questions on direct, as opposed to collateral issues, that his testimony is excised. The questions asked of Noriega were aimed at undermining his credibility. His credibility had already been the subject of intense attack during cross-examination. Therefore, as in *Diecidue*, "the responses illicited by defendants' questions would have been mere cumulative evidence of credibility." 603 F.2d at 552. The trial judge's refusal to strike the responses was not erroneous. This same rationale applies to defendants' argument relating to witness Joseph Carter's decision to invoke his Fifth Amendment privilege.[11]

### 5. Noriega's Competence to Testify

 Noriega's competence to testify has been attacked by several defendants who contend that Noriega was incompetent and that his testimony was incredible as a matter of law. As discussed earlier, whether a witness is competent to testify is a question of law for the trial judge. Unless an abuse of discretion is demonstrated, the trial judge's decision will not be disturbed. *United States v. Killian*, 524 F.2d 1268 (5th Cir. 1975), *cert. denied*, 425 U.S. 935, 96 S.Ct. 1667, 48 L.Ed.2d 177 (1976). No such demonstration has been made.

### 6. Admissibility of Plea Agreement

Appellants object to the introduction into evidence of Noriega's plea agreement. Complaints are specifically made with reference to portions of the plea agreement that mention needed protection for Noriega and his family and his promise to testify "truthfully." Appellants concede that they cross-examined Noriega extensively about his plea agreement; nevertheless, they allege that the areas of the agreement to which they object were not covered in their cross-examination.

 The possibility that the jury would infer that the defendants were the source of danger to Noriega was eliminated by the trial judge's comments to the jury that the source of the threat was not the defendants in the instant case, but rather the defendants in another case in which Noriega had testified. As relates to the issue of the threat, it was not error to allow the jury to view the agreement between Noriega and the government. Nor did the plea agreement constitute an impermissible affirmation or bolstering by the prosecutor of the credibility of a government witness. The statement in the plea agreement that Noriega promised to testify "truthfully" does not constitute error-laden vouching for the credibility of a government witness. *United States v. Arroyo-Angulo*, 580 F.2d 1137 (2d Cir.), *cert. denied*, 439 U.S. 913, 99 S.Ct. 285, 58 L.Ed.2d 260, and 439 U.S. 1005, 99 S.Ct. 618, 58 L.Ed.2d 681 (1978), and 439 U.S. 1131, 99 S.Ct. 1052, 59 L.Ed.2d 93 (1979); *United States v. Isaacs*, 493 F.2d 1124 (7th Cir. 1974). As we stated in *United States v. Rosson*, 441 F.2d 242, 244 (5th Cir. 1971): "If the defense relies upon the existence of the plea bargain to attack the credibility of the witness, it is not then entitled to preclude the jury from being apprised of additional matters relevant to the bargain so as to leave an incorrect inference that the witness has made a better bargain for himself ... than in fact he has made." The court properly admitted the plea bargain agreement into evidence; appellants' arguments to the contrary are rejected.[12]

---

**11.** Defendants also claim that their right of cross-examination was impaired when Noriega asserted his attorney-client privilege in response to the question whether he had asked his attorney to work with the U.S. Attorney on his behalf. This claim is frivolous. The response was given only once during extensive examination. Noriega was subsequently asked whether he had sought help from the U.S. Attorney and he answered affirmatively. No possible harm resulted from his initial assertion of the privilege.

**12.** Appellants also contend that the document was inadmissible as hearsay. This argument misses the mark. The document was not introduced to establish the truth of the factual assertions contained therein; rather, it was merely introduced to establish the fact of its existence and contents. As such, it was not hearsay.

### 7. References to Polygraph Tests

During cross-examination, Noriega made reference to his willingness to take a lie detector test.[13] The defendants argue that the comment was so prejudicial that a mistrial should have been granted. It is currently the law in this circuit that the results of a polygraph test are inadmissible in evidence. *United States v. Clark,* 598 F.2d 994 (5th Cir. 1979). Because the jury is not allowed to know the results of the test, appellants insist that to permit a witness to testify concerning his willingness to take the test constitutes improper bolstering. Although we agree that Noriega's response to the question was improper, we do not agree that it was prejudicial to the point of measurably affecting the jury's verdicts. The trial judge not only cautioned the jury twice to disregard Noriega's comment, he also told them why such an instruction was being given. He explained that polygraph tests have not yet achieved sufficient scientific reliability to be admissible in evidence. If there was any prejudice to the defendants, such prejudice was cured by the careful manner in which the trial judge handled the situation.[14]

### 8. Comment on Defendants' Failure to Testify

Appellants suggest that an exchange that occurred after Noriega's response as set forth in footnote 13, was grounds for a mistrial. They claim that the prosecutor made an improper reference to the decision of some of the defendants not to testify. That reference ostensibly occurred during the following exchange:

THE COURT: Well, I will instruct the jury to altogether disregard that last part of the witness's answer.

MR. COHEN: Judge, I would like to be heard on that outside the presence of the jury. I think—

THE COURT: Well, you may.

MR. COHEN: I think that my client will be more than willing to enter that sort of stipulation.

MR. HOGUE: (The Prosecutor) Objection to counsel testifying. If he wants to take the stand he may.

At this point the judge excused the jury and held a discussion with counsel.

The comment by the prosecutor that "If he wants to take the stand he may," immediately followed the prosecutor's objection to defense counsel testifying. It strains credulity to believe that the prosecutor was referring to a defendant. To accept the appellants' argument we would have to view that statement out of the context in which it was said, a clearly impermissible approach. *See United States v. Austin,* 585 F.2d 1271 (5th Cir. 1978). Furthermore, the statement was not of "such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *United States v. White,* 444 F.2d 1274, 1278 (5th Cir.), *cert. denied,* 404 U.S. 949, 92 S.Ct. 300, 30 L.Ed.2d 266 (1971). It was not a reversible error reference to the defendants' election not to testify.

### 9. Miscellaneous Improper Comments

Various responses given by witnesses during the trial are challenged as

---

13. The comment arose during the following exchange:

Q. (By defense attorney Mr. Cohen) Now, do you know, sir, that you like to do a good job as a witness in this case for the Government; do you not?
A. I'm testifying to the truth, sir.
Q. Would you like to see the Government win this case?
A. It doesn't make any difference to me.
Q. You don't care; is that your testimony?
A. My testimony is I am here to testify to the truth, and I am willing to take a lie detector test if your client is.

14. There was another reference made to the polygraph test by government witness James Earl Wright. Under cross-examination concerning a pending state charge against him, Wright said that he really was not concerned about the charges because he knew he could beat those charges by taking a polygraph test. The reference had nothing to do with the charges that were the subject of the trial. No prejudice occurred as a result of that fleeting comment.

being so prejudicial that they denied the defendants a fair trial. Our review of the record leads to the conclusion that these responses did not result in prejudice to the defendants. In reaching this conclusion we follow the guidelines expressed in *United States v. Hyde*, 448 F.2d 815, 847 (5th Cir. 1971), *cert. denied*, 404 U.S. 1058, 92 S.Ct. 736, 30 L.Ed.2d 745 (1972): "Allegedly improper statements should not be viewed in the abstract. The question is what impact they had in the context of the particular trial in terms of their relevance and the quantity of untainted evidence in the case." As we noted earlier, this trial lasted over three months and the record includes more than 11,000 pages of testimony. We cannot say that the four or five responses complained of by the defendants measureably affected the jury in any way. This complaint is likewise without merit.

### 10. Exclusion of Hearsay Testimony

Lazzara argues that certain hearsay testimony was wrongfully stricken from the record, resulting in prejudicial and reversible error. We do not agree. The hearsay testimony was elicited from witness Ruth McElroy, the mother of Hiram McElroy who was working for Lazzara at a Miami laundromat when it burned. Noriega testified that, as part of the scheme, he took Hiram McElroy to the bus station in Miami and then returned to the laundromat to set the fire. Noriega admitted responsibility for the fire, saying he set it at Lazzara's request. Hiram McElroy, on the other hand, allegedly told his mother that he was sleeping in the laundromat when the fire broke out and that earlier he had been cooking on a hot plate and may have left it on. McElroy died prior to trial and Lazzara tried to get his statement into evidence as an exception to the hearsay rule under Rule 804(b)(3), Fed.R.Evid. The trial judge ruled the testimony was inadmissible hearsay. Rule 804 provides in part:

(a) Definition of unavailability.—'Unavailability as a witness' includes situations in which the declarant—

\* \* \* \* \* \*

(4) is unable to be present or to testify . . . because of death . . . .

(b) Hearsay exceptions.—The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

\* \* \* \* \* \*

(3) Statement against interest.—A statement which . . . at the time of its making . . . so far tended to subject him to civil . . . liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true.

In relying on this hearsay exception rule, Lazzara argues that McElroy subjected himself to civil liability by admitting possible fault in the laundromat fire.

We find no error in the judge's decision to strike the hearsay testimony. As reflected by the specific language used in Rule 804(b)(3), the statement against interest must be almost a direct, outright statement that the person was legally at fault. McElroy's statement simply indicated that he might have been the one who caused the fire. There was testimony from fire inspectors that a hot plate was involved but that the fire was the result of arson. We agree with the trial judge that McElroy's statement was not a declaration sufficiently subjecting him to civil liability to invoke the quoted exception to the hearsay rule.

### 11. Sequestration Breaks

Appellants complain that once the trial judge chose to sequester the jury, it was error for him then to allow breaks in that sequestration by permitting the jurors to visit with family members without repeatedly reinstructing them about avoiding outside influence. Before a reversal will lie on this ground, appellants "must demonstrate a substantial likelihood that some prejudice did result." *United States v. Harris*, 458 F.2d 670, 675 (5th Cir.), *cert. denied*, 409 U.S. 888, 93 S.Ct. 195, 34 L.Ed.2d 145 (1972).

The trial judge has the discretion to decide whether to disperse the jury. *Tyler v. United States*, 397 F.2d 565 (5th

Cir. 1968), *cert. denied*, 394 U.S. 917, 89 S.Ct. 1187, 22 L.Ed.2d 450 (1969). In the cases dealing with breaks in sequestration, emphasis is usually placed upon the fact that the judge reminded the jury to avoid outside influence. *United States v. Banks*, 485 F.2d 545 (5th Cir. 1973), *cert. denied*, 416 U.S. 987, 94 S.Ct. 2391, 40 L.Ed.2d 764 (1974); *Tyler, supra*. In the instant case, while the jury was not reinstructed prior to every break in sequestration, they were constantly reminded during the course of the trial (at which time they were not under order of sequestration) not to discuss the case with anyone and to avoid reading any publicity concerning the trial. While sequestered, and pursuant to the judge's orders, the U.S. Marshals (in whom custody of jurors is entrusted) repeatedly reminded the jurors to refrain from discussing the case. Newspapers brought in by family members were edited before being given to the jurors. There can be no doubt that the jurors were fully aware of their responsibilities.

The jurors deliberated for 3½ weeks; their sequestration spanned three weekends. We see no error in the judge allowing jurors to visit with their families at the hotel on Sundays. In light of the precautions taken by the judge during the trial, and through the marshals during deliberations, we see no basis for the contention that the defendants were prejudiced by the judge's failure to reinstruct the jurors personally or to voir dire each one concerning possible exposure after the visitation periods. The allowance of family visits was a reasonable, humane and understanding act by the trial judge. No reversible error lurks within.

### 12. Miscellany

Finally, Russello urges three other assignments of error: a biased grand jury, exclusion of evidence about Noriega's character and an improper jury charge.

#### a. Grand Jury Bias

Russello contends he was deprived of his right to an unbiased grand jury because of two incidents. First, he complains that the prosecutor should not have called him to testify before the grand jury because after he received his subpoena, his attorney advised the prosecutor that Russello intended to exercise his Fifth Amendment privilege. Russello was nevertheless called as a witness; he exercised his Fifth Amendment privilege.

 It has long been recognized that "[c]itizens generally are not constitutionally immune from grand jury subpoenas." *Branzburg v. Hayes*, 408 U.S. 665, 682, 92 S.Ct. 2646, 2657, 33 L.Ed.2d 626 (1972). Our courts have repeatedly reaffirmed "the historically grounded obligation of every person to appear and give his evidence before the Grand Jury." *United States v. Dionisio*, 410 U.S. 1, 9, 93 S.Ct. 764, 769, 35 L.Ed.2d 67 (1973). "The personal sacrifice involved is a part of the necessary contribution of the individual to the welfare of the public." *Blair v. United States*, 250 U.S. 273, 281, 39 S.Ct. 468, 471, 63 L.Ed. 979 (1919). Russello's claim that he should not have been called after revealing his intention to remain silent is without merit.

 Russello also alleges that after his appearance before the grand jury, he learned that the prosecutor, in the presence of the grand jury, told Farina that he, Farina, was a disgrace for exercising his right to remain silent. Russello argues that this was also a reflection on his right to remain silent. He points to no specifics to show that the jury imputed to him the prosecutor's comment and attitude toward Farina. We do not agree that the prosecutor's comment about Farina was an attack on Russello's character. Russello was not denied the right to an unbiased grand jury.

#### b. Exclusion of Evidence

The thrust of Russello's second contention is that he and his family were threatened by Noriega, that his building had been burned without his knowledge and that he had paid Noriega only because Noriega extorted the money. To support the argument that Noriega was a violent man, and to rebut inferences from government testimony to the contrary, Russello called a wit-

ness who was to testify about shooting Noriega after Noriega threatened the witness's employer. The trial judge ruled the evidence inadmissible under Fed.R.Evid. 608(b).

Russello relies on *United States v. Opager*, 589 F.2d 799 (5th Cir. 1979), where the trial judge excluded certain business records which would have shown that one of the government's key witnesses was lying about a fact material to Opager's defense. In response to Opager's defense of entrapment, the government witness testified, in an effort to show the defendant's predisposition to commit the crime, that he had worked with the defendant and had seen her engage in the same criminal conduct. The business records Opager sought to introduce would have established that she and the witness had not worked together at the pertinent time. In reversing the conviction, we emphasized that the evidence did not merely go to the witness's character for truthfulness, but rather was relevant specifically to contradict the witness's testimony as to a *material issue*. *Opager* is distinguishable from the situation in the case at bar.

■ Although Russello relied on the defense that he acted in response to threats from Noriega, Noriega's threats against the employer of the witness called by Russello did not relate directly to Russello as the excluded testimony in *Opager* related directly to the defendant. The material issue here was not whether Noriega had threatened the witness's employer, but whether Noriega had threatened Russello. The evidence was not relevant to a "material issue" within the context of *Opager*. We find no error in the exclusion of this testimony.

### c. Jury Instruction

■ Russello contends that the trial judge did not correctly charge the jury as to the evidence required for a mail fraud conviction. The challenged portion of the jury charge states: "A statement or representation may also be 'false' or 'fraudulent' when it constitutes a half-truth, or effectively conceals a material fact, with intent to de-

fraud." Russello relies on *United States v. Meadows*, 598 F.2d 984 (5th Cir. 1979), in which we held that a similar instruction created reversible error. There is one dispositive difference between the charge in *Meadows* and the charge *sub judice*. The trial judge in *Meadows* stated that "under the law fraud may result from statements of half-truths or the concealment of material facts." *Id.* at 987. The statement that created reversible error resulted from the failure by the court to remind the jury of the intent required to convict. In the instant case the trial judge added four critical words to the instruction that had been found wanting in *Meadows*; the instruction complained of here concludes with the words "with intent to defraud." That phrase takes this instruction out of the *Meadows* category and compels our rejection of this claim.

### G. *Sufficiency of the Evidence*

■ Most of the appellants challenge the sufficiency of the evidence to support their convictions on both the RICO and the mail fraud charges. We recently reiterated the standard for review of such a challenge in *United States v. Marx*, 635 F.2d 436, 438 (5th Cir. 1981):

In reviewing the sufficiency of the evidence, we must view all the evidence, direct and circumstantial, in the light most favorable to the government, and must accept all reasonable inferences and credibility choices that tend to support the jury's verdict. (Citations omitted.) The standard of review is whether a jury could reasonably find that the evidence was inconsistent with every reasonable hypothesis of innocence or, put another way, whether a reasonably minded jury must necessarily entertain a reasonable doubt of the defendant's guilt.

With respect to the conspiracy convictions, the test on appeal is whether there is substantial evidence to support the verdicts. *Id.; United States v. Malatesta*, 590 F.2d 1379 (5th Cir.) (en banc), *cert. denied*, 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777 (1979). We shall review the RICO convic-

tions separate from the mail fraud convictions because of the obvious difference in the evidence required to sustain convictions.

### 1. RICO Convictions

Five necessary elements comprise a substantive RICO charge. The government must prove (1) the existence of the enterprise; (2) that the enterprise affected interstate commerce; (3) that the defendant was employed by or associated with the enterprise; (4) that he participated in the conduct of the affairs of the enterprise; and (5) that he participated through a pattern of racketeering activity.

In reviewing the RICO convictions we bear in mind the broad reach of the RICO statute, as articulated in *Elliott*, 571 F.2d at 903:

> The substantive proscriptions of the RICO statute apply to insiders *and outsiders*—those merely "associated with" an enterprise—who participate directly *and indirectly* in the enterprise's affairs through a pattern of racketeering activity. (Citations omitted.) Thus, the RICO net is woven tightly to trap even the smallest fish, those peripherally involved with the enterprise. (Emphasis in original.)

Even with a tightly woven net however, a fish, of whatever size, cannot be trapped unless he is "employed by or associated with" the enterprise. In other words, the fish must first be swimming in the stream where the net has been placed before we reach the question of size. The indications from *Elliott* that only minimal association is necessary have caused fine lines to be drawn in determining those who are guilty of violating RICO and those who are not. A defendant must know *something* about his co-defendants' related activities which make up the enterprise, but it is not necessary that he be aware of *all* racketeering activities of each of his partners in the enterprise. *Diecidue.*

To convict on a charge of conspiracy, the government must prove that the defendant had knowledge of the conspiracy and that he intended to join in the objectives of the conspiracy. The degree of criminal intent necessary for participation in a conspiracy must be *at least* equal to that required for the substantive offense itself. *Malatesta.* More specifically, to convict for conspiracy to violate RICO the government must prove that the person objectively manifested, through words or actions, an agreement to participate in the conduct of the affairs of the enterprise through the commission of two or more predicate crimes. *Bright* and *Elliott.*

### 2. Mail Fraud Convictions

The elements of the offense of mail fraud have been discussed in numerous decisions in this circuit, including the concise distillation in *United States v. Green*, 494 F.2d 820, 823–24 (5th Cir.), *cert. denied*, 419 U.S. 1004, 95 S.Ct. 325, 42 L.Ed.2d 280 (1974):

> The two basic elements of a mail fraud scheme are (1) the scheme to defraud, and (2) causing a mailing for the purpose of executing the scheme. While the mailing must, as the statute requires, be "for the purpose of executing the scheme ... [i]t is not necessary that the scheme contemplate the use of the mails as an essential element. Indeed, it is sufficient if the mailing that is caused is "a part of the execution of the fraud," or is "incident to an essential part of the scheme." One "causes" the mails to be used when one "does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended." (Citations omitted.)

Thus, it is clear that if there is sufficient evidence to connect a defendant to the fraudulent scheme involving use of the mails, it is not necessary that he do any of the mailing. Co-schemers are jointly responsible for each other's acts when the acts are within the general scope and in furtherance of the scheme. *United States v. Rodgers*, 624 F.2d 1303 (5th Cir. 1980).

With these elements and standards in mind, we examine the claims of the various defendants that the evidence was insufficient to justify their convictions.

## THE ARSONISTS

*Frank Scionti:*

██ Scionti was found guilty on both RICO counts (Counts 1 and 2) and on four counts of mail fraud (Counts 3, 4, 5 and 6). Counts 3 and 4 dealt with the fire at 1811 Taliaferro Street. Counts 5 and 6 pertained to the laundromat fire in Miami. Scionti does not specifically assert that the evidence was insufficient to support his convictions on the mail fraud counts. The jury's verdict is therefore not challenged on those four counts. Furthermore, he concedes that the evidence was sufficient to support his convictions if the testimony of Noriega is to be accepted. His argument that Noriega was incompetent as a witness and because of his mental condition could not be considered credible as a matter of law, has been discussed and decided adversely to him. *See United States v. Parker,* 586 F.2d 422 (5th Cir. 1978), *cert. denied,* 441 U.S. 962, 99 S.Ct. 2408, 60 L.Ed.2d 1067 (1979); *Jackson, supra.* We affirm Scionti's convictions.

*Paul Guarino:*

██ Guarino was convicted on both RICO counts and on fifteen counts of mail fraud. He does not specifically challenge the sufficiency of the evidence on any count. In his brief, he posits the "Statement of Issues," which does not question the sufficiency of the evidence, and then adopts the arguments advanced by the co-defendants in support of those issues and any other issues they raised that may apply to him. Although this is not an appropriate challenge to the adequacy of the evidence, we have made a general review of the evidence against Guarino and find it sufficient to convict him on the RICO counts and thirteen of the mail fraud counts. As to Counts 17 and 18, for the reasons discussed *infra,* with respect to defendant Lostracco, we reverse Guarino's convictions. The evidence does not establish that the charged mail frauds occurred.

## THE FINANCIERS

*Berton B. Chase:*

Chase is the only defendant charged solely with conspiracy. He argues that the evidence was insufficient to support his conviction because it showed an agreement to commit only one predicate act rather than the requisite "pattern of racketeering activity." We agree.

Chase was indicted because of his involvement in the arson of a warehouse located on 12th Street in Tampa. Martino had a ninety day option on the building. Noriega and Guarino acquired the option from Martino and upon exercising it, put title in the name of Alex Fekete, an unindicted co-conspirator who testified as a government witness. As part of the purchase arrangements, Fekete gave the seller a first mortgage covering the credit portion. Insurance coverage was to be transferred to Fekete and additional coverage was obtained. When more money was needed for building repairs, Chase was approached. He arranged for a loan of $12,000 by a client, secured by a second mortgage on the property, and received $6,000 as a "kickback." The mortgage was to be paid with insurance proceeds expected from the planned arson.

Fekete was to maintain the insurance coverages, however, he became delinquent in paying the premiums. The seller paid the premiums on the original policy and threatened to foreclose on his mortgage unless he. was reimbursed for the money advanced. In order to prevent the foreclosure, and to protect his client's interest as holder of the second mortgage, Chase reimbursed the seller.

An attempt was later made to transfer title from Fekete to the second mortgage holder. Before the transfer was completed, and pursuant to Chase's instructions, Noriega burned the warehouse. Because Fekete had failed to pay the premiums on the additional insurance he had secured, only the insurance the seller had purchased was collected.

The evidence appears sufficient to convict Chase of arson or of conspiring to commit

that offense, but those are not the charges for which he stood trial. He was charged and convicted of conspiring to participate in the conduct of the affairs of an enterprise through a pattern of racketeering activity. As pointed out in *Elliott*, 571 F.2d at 902, "the object of a RICO conspiracy is to violate a substantive RICO provision ... and not merely to commit each of the predicate crimes necessary to demonstrate a pattern of racketeering activity." One who does not agree to do that vital element—participate in the enterprise through the commission of at least two predicate acts—cannot be convicted on a RICO conspiracy charge. In effect there are two agreements contained in a RICO conspiracy charge: an agreement to participate and an agreement to commit at least two proscribed acts.

A review of the evidence reflects that Chase agreed to arrange a loan secured by mortgage on a building, with the knowledge the building would be burned and the mortgage would be paid with a portion of the insurance proceeds. He received a "kickback" for his efforts. According to Noriega, Chase set the time for the fire. Chase also acted to protect Fekete's ownership of the building by reimbursing the seller's insurance premiums in order to avoid foreclosure on the first mortgage.

██ The only agreement which may be classified as an agreement to commit a predicate crime as defined in § 1961 is Chase's agreement to commit arson. Chase was not charged with mail fraud. There was no mail fraud committed in connection with that arson because the only insurance claim submitted was that of the former owner/mortgagee on a legitimate policy. The only predicate act enumerated in the indictment implicating Chase involves the arson of the warehouse.

Absent a charge and proof of an agreement to commit two of the specified predicate crimes, a defendant cannot be convicted of conspiring to participate in the affairs of an enterprise through a pattern of racketeering activity. Chase's conviction for conspiring to violate RICO is invalidly based and must be reversed.

*Sam Martino* :

Martino does not challenge the sufficiency of the evidence on his convictions of the mail fraud counts (Counts 14, 15 and 16). With respect to the RICO convictions, Martino argues that as a mere customer of the services offered by the enterprise, his conduct did not fall within the proscription of RICO. The evidence establishes that Martino was more than a customer of the enterprise, he was a recurring figure in the activities of the enterprise.[15] As a real estate agent and mortgage broker, Martino played a multifaceted role. The evidence shows that he assisted in the acquisition of three properties in Tampa that were considered suitable for burning.

The property located at 2020 E. Columbus was purchased by Noriega through the assistance of Martino. The prior owner had been making mortgage payments to Martino's Ybor Loan Company but sold the house because of tax problems and because it became apparent that costly repairs would have to be made to avoid condemnation by housing inspectors. The first mortgage on the house was assumed by Noriega and an existing $4,000 insurance policy was transferred to him. Noriega doubled the existing coverage before acquiring two additional policies, each affording $15,000 protection. Carter was instrumental in obtaining the additional insurance. Four months after the house was acquired, it was burned by Noriega and Guarino and insurance pro-

---

**15.** Martino points to his acquittal on several counts as support for his argument that his limited contacts with the enterprise, evidenced by his conviction on charges relating to only one fire, did not amount to participating in the conduct of the affairs of the enterprise. While the jury may not have found that the government proved Martino's guilt in the mail fraud scheme, that does not necessarily mean that the jury did not believe that Martino was somehow involved. The evidence of his involvement, while not sufficient to convict for mail fraud, would support the conclusion that he was associated with the enterprise and a participant in the conduct of its affairs.

ceeds were collected on the policies.[16] Martino had ordered the cancellation of the $8,000 policy transferred from the prior owner although the order did not go into effect until after the fire. The mortgages held by Martino's loan company were paid with insurance proceeds.

With the help of Martino, Noriega was able to purchase additional substandard property located at 3006 N. Nebraska.[17] Martino initially arranged a loan to Noriega for $7,000, taking a "kickback" of $1,500. Later, when money was needed for repair work, Martino arranged a $1,500 loan secured by a second mortgage. Noriega then sold the property to Macaluso, paying the mortgage with the proceeds of the sale.

Martino also had a connection with the warehouse discussed earlier. He initially leased the property for one year and had a ninety day option. His original plans were to over-insure the building and then burn it. These plans changed and he sold his interest in the property to Noriega and Guarino and assigned the option.

■ The evidence reflects more than Martino's mere association with the enterprise; it shows that he played an important role by assisting in the acquisition of properties suitable for burning. His participation in the conduct of the affairs of the enterprise is further evidenced by his conviction on the three counts of mail fraud. We affirm his conviction on Count 2. The evidence is sufficient to sustain the conviction on Count 1. The requisite element of agreement is apparent from his actions.

## THE MISGUIDED ENTREPRENEURS

*Amalia Morgado*:

■ Morgado does more than claim that the evidence is insufficient to support her convictions on Counts 21 and 22; she argues that there is *no* evidence that she placed or caused to be placed, in the United States mail, the Proof of Loss which is the subject of those counts. After reviewing the record, we agree that there was no evidence offered showing that Mrs. Morgado personally mailed the Proof of Loss. Such evidence is not required, however, to support the convictions on the mail fraud counts. "It is well settled in this circuit that so long as one participant in a fraudulent scheme causes a use of the mails in execution of the fraud, all other knowing participants in the scheme are legally liable for that use of the mails." *United States v. Toney*, 598 F.2d 1349, 1355 (5th Cir. 1979), *cert. denied*, 444 U.S. 1033, 100 S.Ct. 706, 62 L.Ed. 670 (1980). The evidence shows that Morgado was involved with several other defendants in the scheme to defraud the insurer through the arson of the Vasconia Street property. The mail fraud convictions are supported by the requisite evidence.

■ The evidence, viewed through the mandated appellate prism, shows that Morgado served on the "marketing" staff of the enterprise as a connection between persons wanting to burn their property and the arsonists. She was instrumental in arranging for Noriega to burn the Vasconia Street property owned by co-defendant John Alan Holt. She made the initial contacts and paid Noriega for his services with checks written on her personal account. Her participation in at least the initial stages of the fraudulent scheme is apparent. Once she became involved in the scheme, she had to do some affirmative act of withdrawal before she may disclaim responsibility for the subsequent acts of her co-schemers. *United States v. Bradsby*, 628 F.2d 901 (5th Cir. 1980). There is no evidence of any affirmative action on the part of Morgado to withdraw from the scheme.

■ Having concluded that the evidence was sufficient to convict Morgado on the two counts of mail fraud, we examine her convictions on the RICO substantive and conspiracy counts. Morgado was involved in arson and mail fraud, both of which are statutorily designated predicate crimes and

---

**16.** Martino was convicted on three mail fraud counts relating to the fire at this location.

**17.** Martino was acquitted on the mail fraud counts relating to this property.

base the charge that she engaged in a "pattern of racketeering activity." The final inquiry is whether Morgado's association with the enterprise has been established. The evidence implicated Morgado in another Tampa arson that was not included in the mail fraud counts. Again acting as the "marketing" person for the enterprise, Morgado arranged for her sister to buy substandard property which later was burned. Her sister recovered under a fire insurance policy after Morgado acted as notary on the Proof of Loss. Morgado was associated with the enterprise; she worked at furthering the business in which the enterprise was engaged. Convinced that the evidence sufficiently establishes all of the elements required for a RICO substantive offense, we affirm Morgado's conviction on Count 2. The evidence also establishes the required element of agreement, accordingly, Morgado's conviction on Count 1 is also affirmed.

*Joseph Macaluso :*

Macaluso was convicted on both RICO counts and on five counts of mail fraud. His challenges to the mail fraud convictions stem from a variance between the indictment and the proof adduced at trial and point to an alleged inconsistency in the verdicts with respect to other defendants also charged in the counts.

■■■■ Counts 11, 12 and 13 arose out of the arson and subsequent collection of insurance proceeds for property located on N. Nebraska. The indictment charged Macaluso, Morgado, Martino, Carter, Guarino and Noriega. The jury acquitted Martino, Morgado and Guarino on these counts. Noriega and Carter pled guilty. Macaluso argues that the verdicts necessarily indicate that the jury rejected Noriega and Carter as credible witnesses and, therefore, his conviction must be reversed because it is inconsistent with the verdicts on the others. We do not agree. A similar argument was rejected in *United States v. Dubea*, 612 F.2d 950 (5th Cir. 1980), and in *United States v. Michel*, 588 F.2d 986 (5th Cir.), *cert. denied*, 444 U.S. 825, 100 S.Ct. 47, 62 L.Ed.2d 32 (1979). Our inquiry on appeal is limited to

determining whether the evidence is sufficient to support the counts on which the appellant was convicted; we do not look at what the jury did with other counts or other defendants. Because the jury may have chosen not to believe Carter and Noriega with respect to the other defendants does not mean that they had to find those witnesses not credible as to their testimony concerning Macaluso. Reviewing the evidence against Macaluso, we find that there was sufficient evidence to support his convictions on Counts 11, 12 and 13. Those convictions are affirmed.

Counts 7 and 8 charge mail fraud with respect to the arson and subsequent collection of insurance proceeds for property located at the corner of 10th Street and 12th Avenue. Macaluso challenges his conviction specifically on Count 8 because, while the indictment charged that the object of the Count 8 mail fraud was mailed from New York to Jacksonville, the evidence showed that the mailing occurred between Jacksonville and Tampa. This inconsistency, it is argued, prejudiced Macaluso's substantial rights to the extent that a reversal is warranted.

■■■■ We find a variance between the indictment and the evidence as to the specific mailing locations involved in Count 8. We do not agree, however, that this variance affected Macaluso's substantial rights. The addresses of the sender and addressee were not the only information set forth in Count 8. The indictment also set out the numbers of the drafts that were sent through the mail, the names of the payees, and the amounts involved. All of this information was correct. The variance in *United States v. Cook*, 586 F.2d 572 (5th Cir. 1978), *cert. denied*, 442 U.S. 909, 99 S.Ct. 2821, 61 L.Ed.2d 274 (1979), where the indictment charged a mailing to the United States Air Force and the evidence showed the mailing went to the General Services Administration, was considered a "technical variance . . . best relegated to the 'immaterial' category." *Id.* at 575. Considering the totality of the circumstances at bar, this expression from *Cook* applies. The vari-

ance Macaluso notes is not reversible error. Macaluso does not point to any specifics with regard to the claim of insufficient evidence as to Count 7. Our general review discloses the evidence is sufficient. The convictions on Counts 7 and 8 are affirmed.

■ With regard to his RICO convictions, Macaluso argues that if he was involved in a conspiracy, it was for the limited purpose of aiding in the arson. Our review of the evidence results in a contrary conclusion. The arsons in which Macaluso was involved were part of the main business of the enterprise. He acted as the go-between or contact person for the arson of the 10th Street and 12th Avenue property, and he participated in its burning. He was also the owner of the N. Nebraska property that was burned. Several members of the enterprise were involved in those incidents. We are persuaded that the evidence establishes Macaluso's active involvement in the affairs of the enterprise.

Macaluso's final contention is that the evidence did not show he intended to further the affairs of the enterprise. This argument is without merit. By his active involvement Macaluso did further the enterprise's affairs. We affirm Macaluso's convictions on Counts 1 and 2.

*John Lostracco*:

Lostracco was convicted on RICO Counts 1 and 2 and mail fraud Counts 17 and 18. He challenges the sufficiency of the evidence. We agree.

■ An arson committed at a 27th Street address provides the basis for the mail fraud charges. The property was owned by Lostracco's brother-in-law and sister-in-law, Mr. and Mrs. Joseph Bartolotti. Lostracco acted as the real estate agent for the proposed sale from the Bartolottis to Noriega and Guarino. Title to the property was to be put in the name of Jimmy Traina, who was to share the fire insurance proceeds with Noriega and Guarino. The Bartolottis were aware only of Traina's interest. Although a contract to sell was executed, the plans went awry when Noriega burned the house before title actually

passed to Traina. At the time of the arson the Bartolottis still owned the property and were the insureds under an insurance policy. There is no evidence that the Bartolottis were involved in the arson or had any knowledge of the plan to burn the building for the insurance.

After learning that the property had been burned and that they were still the owners, the Bartolottis submitted their insurance claim. This claim was not fraudulent; their policy was valid and they were not aware of the arson. Counts 17 and 18 charge Lostracco with mail fraud in connection with the sworn statement in the Bartolotti Proof of Loss and the insurer's draft issued to the Bartolottis. There is no evidence that the Bartolottis submitted a claim under their policy intending to deliver over or share the insurance payment with any member of the enterprise. To the contrary, the evidence reflects that Noriega, Guarino and Traina received the insurance proceeds only after threatening and pressuring the Bartolottis.

■ There is no evidence of Lostracco's involvement in a mail fraud scheme centered on the Bartolottis' 27th Street property because no mail fraud occurred. If the sale had been consummated as planned, and if Traina had collected on the fire policy, a mail fraud would have been perpetrated. Under those circumstances, if Traina had not been able to collect for some reason, the government still could have proven mail fraud because success of the scheme is not required for a conviction. The government takes the position that the facts present an unsuccessful mail fraud scheme and, therefore, Lostracco's convictions must stand. The evidence does not support that conclusion. The Bartolotti claim and the payment to them cannot be transformed into mail fraud and imputed to the enterprise. The previously discussed rule that co-schemers are jointly responsible does not apply because there is no evidence that the Bartolottis were co-schemers. Lostracco's convictions on Counts 17 and 18 must be reversed.

■ In order to be convicted on a RICO substantive charge under § 1962(c), there

must be evidence that the defendant participated in the conduct of the enterprise's affairs through a pattern of racketeering activity which requires the commission of two predicate crimes. The evidence supports findings that Lostracco participated in the arson and in discussions which could lead to mail fraud. Section 1961(1)(B) lists mail fraud as a predicate offense; conspiracy to commit mail fraud is not included and is therefore not a predicate act. The evidence establishes that Lostracco committed only one predicate act. Accordingly, his conviction on Count 2 must be reversed.

Having found that Lostracco is not guilty of the RICO substantive offense because he did not commit two predicate acts, we must now inquire whether the indictment charged and the evidence proved that he *agreed* to commit two recognized predicate acts. The two acts of racketeering charged are the arson at the 27th Street address and the alleged mail fraud resulting from the insurance claim by the Bartolottis.

■ There was no mail fraud committed when the Bartolottis made their fire loss claim. Consequently, Lostracco's involvement in that claim could not constitute an agreement to commit a criminal act. We are cognizant that the evidence reflects a plan by Lostracco and others to commit arson and mail fraud. The mail fraud which was a part of that plan, however, is not the mail fraud charged in the indictment.

A RICO conspiracy conviction requires that the indictment charge and the proof establish the two predicate crimes agreed to. The evidence does not support the charged mail fraud and Lostracco's conviction on Count 1 must be reversed.

## THE DISSATISFIED OWNERS

*John Alan Holt:*

Holt's challenge to the sufficiency of the evidence supporting his mail fraud convictions is based on the government's alleged failure to prove that venue was proper as to Count 21 and the asserted lack of evidence that Holt mailed or caused to be mailed the items named in Counts 21 and 22.

■ Venue for a mail fraud conviction is proper in any of the districts from, through, or into which the item of mail moved. 18 U.S.C. § 3237(a). The government had to show that the Proof of Loss for Holt's insurance claim was either mailed from the Middle District of Florida, mailed to the Middle District of Florida, or that it passed through the Middle District of Florida as it traveled to its destination. The burden of proof to establish venue is not as onerous as the burden required for proof of an element of a crime. Venue need only be proven by a preponderance of the evidence. As long as there is circumstantial evidence in the record supporting the inference that the crime was committed in the district where the trial is held, direct evidence is not required. *United States v. White*, 611 F.2d 531 (5th Cir. 1980); *United States v. Turner*, 586 F.2d 395 (5th Cir. 1978), *cert. denied*, 440 U.S. 926, 99 S.Ct. 1258, 59 L.Ed.2d 480 (1979).

■ The subject of the mail fraud charged in Count 21 is a sworn Proof of Loss signed by Holt which was mailed by the office of the Safeco Insurance Company in Tampa to the Safeco Insurance Company in Atlanta. Holt argues that there is no evidence showing where Safeco in Tampa had mailed the item or where Safeco in Atlanta had received it. This argument is not supported by the record. Dale Jermyn, the former claims manager for the Tampa Safeco office, testified that after the original Proof of Loss was received in his office, it was customary to send it by mail to the Atlanta division office. He further testified that, with respect to the specific Proof of Loss at issue here, the original had been mailed to the Atlanta office by Mr. Parker, the Tampa office adjuster. Holt underscores that Jermyn did not specifically testify that the item was mailed from the Tampa post office. We cannot accept Holt's argument that the jury could just as easily have inferred that Mr. Parker chose to go outside of Tampa and the judicial district, to mail the document. Nor can we accept the suggestion that the document mailed to

the Atlanta office was received somewhere other than Atlanta. Under the facts reflected in this record, the most obvious and compelling inference is that the item was mailed in Tampa and received in Atlanta. Venue properly lies in the Middle District of Florida.

Holt's second argument is based on the absence of testimony pointing to his mailing or causing to be mailed the Proofs of Loss. This argument founders on the rubrics expressed in our prior decisions which speak to the evidence required to sustain mail fraud convictions. It was not necessary to prove that Holt actually did the mailing, "he need only have had a reasonable basis to foresee that his actions would result in the use of the mails." *United States v. Georgalis*, 631 F.2d 1199, 1206 (5th Cir. 1980); *Toney, supra; Banister v. United States*, 379 F.2d 750 (5th Cir. 1967). Though one lacks the actual intent to use the mails, one "causes" the mails to be used when he acts with the knowledge that the mails will be used in the ordinary course of business. *Pereria v. United States*, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954).

The facts surrounding the mail fraud counts against Holt are very similar to those which were before the court in *Banister, supra*. Holt argues that Count 21 charges the sending by one insurance agent of a Proof of Loss to another insurance agent, a mailing with which he had absolutely nothing to do. As to Count 22, he argues that there is no evidence that the attorney who claimed to be representing Holt in sending the Proof of Loss to the insurance agent was acting at Holt's direction. This argument was unsuccessfully urged in *Banister*, where we found that the jury could have reasonably inferred that when the defendants dealt with a local agent of an insurance company, they reasonably should have contemplated that the mails would be used when the local agent dealt with the home company. Likewise, the jury in this case reasonably could have inferred that in filing a claim with his local insurer, Holt should have known that the mails would be used in the processing of his claim. We find sufficient evidence to support Holt's convictions on the mail fraud counts.

Holt's objections to his RICO convictions focus on his level of involvement and the number of people with whom he was involved. He does not deny that an enterprise engaged in the business of burning property with the intent to defraud insurance companies existed; he argues, rather, that the evidence showed his involvement was limited to an association with Noriega, not an association with the overall enterprise. The evidence does not support this argument. Holt's involvement extended beyond an association with Noriega and included contacts with at least Morgado. There was sufficient evidence for the jury to infer that Holt was associated with the enterprise. Once established that he was connected with the enterprise, his participation in the conduct of its affairs was proved by evidence of the arson and the mail frauds. Holt's conviction on Count 2, therefore, is affirmed. Affirmance of the Count 1 conviction for agreeing to participate necessarily follows for the reasons and on the authorities previously discussed.

*Rolando Gonzales Rodriguez:*

Rodriguez stands convicted on four counts: the two RICO counts and Counts 7 and 8 of the mail fraud charges. He adopts by reference the arguments made by his co-defendants with respect to Counts 1, 2 and 7; with respect to Count 8, he relies on the variance argument presented by Macaluso. We have rejected the variance argument and Rodriguez's conviction on Count 8 is affirmed.

Rodriguez's convictions arose out of the arson of property he owned on the corner of 10th Street and 12th Avenue. Macaluso put Rodriguez in touch with Noriega. After agreeing to undertake the "torching," Noriega enlisted the help of Guarino and Macaluso. The fire was only partially successful, but with Carter's help in adjusting the claim, $500 was received from the insurer. Rodriguez does not point

to any specifics with respect to his claim of insufficient evidence to support his convictions on Counts 1, 2 and 7. After making a general review of the evidence, we are persuaded that there is sufficient evidence to support the jury's conclusion that Rodriguez was guilty of the mail fraud charged in Count 7, as well as his guilt of the RICO charges in Counts 1 and 2. His convictions are affirmed.

*Joseph Lazzara:*

Lazzara was convicted on Counts 1, 2, 5 and 6. The charges arose out of the burning of a Miami laundromat owned by Lazzara. We find the evidence sufficient to support the four convictions and affirm.

■ With respect to the mail fraud convictions, Lazzara argues that because no one in the enterprise did the mailing or assisted him in processing his claim, the mailings were not affairs of the enterprise and therefore he should not have been convicted. The acts of mail fraud for which he was convicted directly followed the arson that was committed by the enterprise; the fraudulent collection on the insurance policy was part of the scheme. It was not necessary that members of the enterprise be involved in the actual filing of the claim. Mail fraud is listed as one of the designated predicate crimes; the mail frauds charged herein were clearly related to the affairs of the enterprise. *See Bright, supra.* Lazzara's argument to the contrary is infirm.

■ Lazzara's challenge to the sufficiency of the evidence to support his convictions for RICO violations is based on an erroneous interpretation of what is required for a RICO conviction. He argues that the phrase "to conduct or participate in the conduct" of the affairs of an enterprise means that the person must be involved in the control or management of the enterprise. This contention has been proffered and rejected. *See Tucker, supra.* Section 1962(c) reaches persons employed by or associated with the enterprise who are not involved in management. It was not necessary to show that Lazzara was in a management position for a conviction under RICO.

The evidence was sufficient to show his association with the enterprise and participation in its affairs through the arson and mail fraud activities. We affirm Lazzara's conviction on Count 2.

Our affirmance of Lazzara's conviction on Count 2 leads inexorably to affirmance of his conviction on Count 1 for the reasons previously articulated.

*Rosario Palermo:*

■ The jury convicted Palermo on Counts 1, 2, 3 and 4. His appeal on the claim of insufficient evidence, aimed only at the RICO convictions, is multi-faceted. He claims: (1) that the single act of arson in which he was involved did not constitute a pattern of racketeering activity; (2) that a customer of the arson services offered by the enterprise does not fall within the category of associates of the enterprise participating in the conduct of its affairs; and (3) that if his conduct amounted to conspiratorial behavior, it was a limited conspiracy separate and apart from the one alleged in the indictment. Palermo does not specifically challenge the mail fraud convictions. Having examined the evidence generally, we affirm his convictions on Counts 3 and 4.

Property located on Taliaferro Street grounded Palermo's involvement and convictions. Although Guarino was part owner of the property, it was recorded only in Palermo's name. They purchased the building in March 1973 and the existing insurance coverage was transferred to Palermo. The property was partially burned shortly thereafter and insurance was recovered for the damage. In August 1973 Palermo obtained additional insurance on the house after making certain repairs necessitated by the previous fire. In late September Noriega, assisted by Guarino and Scionti, burned the house. The insurance company paid the full face value of the policy.

■ Palermo's first argument is without merit. The alleged "single act of arson committed to defraud an insurance company" actually consisted of the arson and two acts of mail fraud in the collection on the insurance policy. Contrary to Palermo's

suggestion, the two acts of mail fraud were more than "intertwined events" or "incidental statutory violations" arising out of the arson. The arson and mail frauds were evidence of the predicate crimes related to the affairs of the enterprise, thus meeting the requirements for proving a pattern of racketeering activity. *See Bright, supra; United States v. Morris,* 532 F.2d 436 (5th Cir. 1976).

Palermo's second argument is likewise rejected. Palermo was not a mere "customer" of an enterprise offering arson services; he was a part of the enterprise itself, as charged in the indictment. The "enterprise" of which Palermo claims to have been only a customer was not a duly formed corporation with elected officers and annual meetings. It was "an amoeba-like infra-structure," *Elliott,* 571 F.2d at 898, involved in a network of secret criminal activity. Congress decreed that by committing two of the designated predicate crimes related to the affairs of the "enterprise," a person participates in the enterprise and thus violates RICO. As distinguished from the Travel Act, 18 U.S.C. § 1952, and the provision relative to illegal gambling businesses, 18 U.S.C. § 1955, both of which do not reach customers, 18 U.S.C. § 1962 does contemplate the prosecution of those "customers" who engage in a pattern of racketeering activity in furtherance of the affairs of the enterprise. By definition such a person becomes more than a customer of the enterprise.

We also reject Palermo's third argument that his was a limited conspiracy and not the one charged in the indictment. Each arson and subsequent mail fraud committed by the various defendants was a piece of the overall scheme. Palermo's alleged separate conspiracy was not a separate conspiracy at all; it was an integral part of the arson enterprise at work in Tampa. *See Diecidue, supra.* We affirm Palermo's convictions.

18. Martino was charged in Counts 9 and 10 with Farina but was acquitted on those mail fraud charges.

*John Fisher:*

Fisher stands convicted on Counts 1, 2, 32 and 33, based on his involvement in the N. Armenia Street fire. His challenge to the sufficiency of the evidence is based solely on Noriega's alleged incompetence and lack of credibility as a matter of law. That issue has been discussed and resolved adversely to Fisher. His convictions are affirmed.

*Jimmy Farina:*

Farina, a former Captain with the Tampa Fire Department, stands convicted of the two RICO counts and of mail fraud Counts 9 and 10. The convictions are based on the arson involving Farina's property on 20th Avenue in Tampa.

The evidence reflects that Farina met with Noreiga and Martino to discuss the acquisition of certain property located off Bayshore Boulevard in Tampa. Their plans were to insure and then burn the property to collect the insurance. The property was to be put in Noriega's name because no property titled in his name had been burned as of that time. These plans were aborted.[18] During discussions concerning other property, Farina made known that he wanted his 20th Avenue building burned. The building was insured for $4,000 and Farina agreed to pay Noriega 10% to burn it. Noriega and Guarino subsequently set fire to the premises. Farino submitted a claim on his policy and recovered the full $4,000. Noriega was paid $400.

Farina contends that the evidence offered was insufficient to prove that he was associated with the enterprise, participated in the conduct of its affairs or conspired with its members. He argues that albeit he purchased Noriega's services, he could not have joined the enterprise because the evidence does not show he had knowledge that Noriega acted in concert with others. The jury may draw the natural inferences arising from evidence, including an inference of association, and was

entitled to infer that Farina, while dealing directly only with Noriega and possibly Martino, was aware of the existence of the ongoing arson operation. Farina approached Noriega with the suggestion that they acquire, insure and burn property, as well as the suggestion that his property on 20th Avenue be torched. It is reasonable to infer from that evidence that Farina indeed knew about the person with whom he was dealing. "A party to a conspiracy need not know the identity, or even the number, of his confederates." *Elliott*, 571 F.2d at 903, *quoting United States v. Andolschek*, 142 F.2d 503, 507 (2d Cir. 1944). The government did not have to prove that Farina knew all of the details or the full extent of the enterprise; proving knowledge of the essential nature was sufficient. Furthermore, "[w]hen a person 'embarks upon a criminal venture of indefinite outline, he takes his chances as to its content and membership, so be it that they fall within the common purposes as he understands them.'" 571 F.2d at 904. The jury could reasonably infer that by his dealings with Noriega, Farina joined in the activities of the enterprise. That conclusion leads to the inquiry whether Farina can be convicted of a RICO violation when the evidence reflects participation in only one arson. We have answered this inquiry in the affirmative. Once Farina joined the conspiracy, he could "withdraw," but only by taking some affirmative action to defeat or disavow the purpose of the conspiracy. *United States v. Killian*, 639 F.2d 206 (5th Cir. 1981); *Bradsby, supra*. The one claiming withdrawal has the burden of proof. The evidence does not establish withdrawal by Farina. Farina also argues that his participation in the arson and mail frauds constituted a singular criminal episode which does not constitute a "pattern of racketeering activity." This argument has also previously been discussed and rejected.

We find the evidence sufficient to support Farina's convictions on Counts 1, 2, 9 and 10.

*William H. Brown*:

The jury found Brown guilty of Counts 1, 2, 30 and 31. His challenge on appeal targets the convictions on Counts 1 and 2. He argues that the government did not prove the required two predicate acts and, therefore, he could not be found guilty of violating RICO. We disagree.

■ Brown bifurcates his argument. First, he contends that his alleged involvement in the fire on Lopez Drive did not amount to a predicate act. The evidence shows that Brown provided Noriega with transportation to and from the site of that arson, waiting nearby while Noriega did his work. Brown denies any knowledge of Noriega's purpose in visiting that address that day. We need not decide whether Brown was guilty of aiding and abetting in that arson because the evidence of his involvement in the burning of his hardware store is sufficient to establish that he engaged in a pattern of racketeering activity.

Brown's convictions are based on the arson of his hardware store located on S. Westshore Boulevard in Tampa. He does not deny that he had the store burned. Instead, he takes the position that the hardware store arson is a single predicate act which is insufficient to support a RICO conviction. This argument has been previously advanced and rejected. Brown's convictions on Counts 1, 2, 30 and 31 are affirmed.

*Robert Young*:

Young's involvement in the arson on N. Armenia Street served as the basis for his convictions on Counts 1, 2, 32 and 33. Young takes the position that the only evidence having any tendency sufficiently to establish his guilt is the testimony of Noriega. He then argues that Noriega was incompetent as a witness for two reasons: (1) based on the psychiatric testimony produced at trial, Noriega was not credible as a matter of law, and (2) because Noriega had already become a government informant by the time the arson occurred on N. Armenia Street, he was incapable of providing the other part of a conspiracy.

■ Young's first argument has already been discussed and rejected. We

likewise reject Young's second argument. From the record it is unclear exactly when Noriega began to talk to state and federal authorities. Tampa Fire Marshal Bertrand O. Fox testified that Noriega first began to cooperate with the FBI in 1975. Noriega testified that his first meeting with government authorities occurred in early 1976, but that the parties involved were not able to reach an agreement at that time and that he did not begin cooperating with them until several months later. While there obviously is a conflict in the evidence as to exactly when Noriega became a government informant, the answer to that question is not as significant as Young suggests. His reliance on *United States v. Chase*, 372 F.2d 453 (4th Cir.), *cert. denied*, 387 U.S. 907, 87 S.Ct. 1688, 18 L.Ed.2d 626; 387 U.S. 913, 87 S.Ct. 1701, 18 L.Ed.2d 635 (1967), is misplaced. That case stands for the proposition that "one who acts as a government agent and enters into a purported conspiracy in the secret role of an informer cannot be a co-conspirator." *Id.* at 459, *citing Sears v. United States*, 343 F.2d 139 (5th Cir. 1965). The rule applies in situations where the conspiracy involves only a defendant and a government informer. In that situation there can be no conspiracy because it takes two to conspire and the government informer is not a true conspirator. *Sears, supra.*

 The conspiracy involving Young included others besides Noriega. For example, Young conspired with John Fisher. His position is not governed by the rule of *Sears*; rather, it comes within the ambit of the rule stated in *Sigers v. United States*, 321 F.2d 843, 848 (5th Cir. 1963), that "a conspiracy may be proved even though the link connecting many of the activities of the conspirators is a Government informer." *See also United States v. Klein*, 560 F.2d 1236 (5th Cir. 1977), *cert. denied*, 434 U.S. 1073, 98 S.Ct. 1259, 55 L.Ed.2d 777 (1978).

Young argues that justice demands that his convictions on the mail fraud counts, Counts 34 and 35, be reversed because there was no evidence to show that he asked, requested or insisted that the insurance

agent use the mails in processing the claim. Further, since John Fisher filed the claim, Young denies any responsibility for the fraud.

 This argument is not persuasive. As noted earlier, it was not necessary that Young actually do the mailing or instruct another to use the mails in order to be guilty of mail fraud. An individual participant in a scheme encompassing mail fraud will be liable for the acts of his co-schemers when such acts are within the general scope of the scheme. He can disclaim responsibility only if he undertakes some affirmative act of withdrawal. *Rodgers, supra.*

 Furthermore, it is well settled that one "causes" the use of the mails when he does some act in which it is reasonably foreseeable that the mails will be used. *United States v. Crockett*, 534 F.2d 589 (5th Cir. 1976). Because Young was in the insurance business, it cannot seriously be contended that he was unaware that the mail would probably be used in processing a claim. The evidence showed that Young was part of the scheme to burn the N. Armenia Street property and recover the insurance proceeds. The convictions of Young are affirmed.

*Joseph C. Russello:*

Russello stands convicted on Counts 1, 2, 28 and 29 as a result of the burning of an office building owned by him on W. Kennedy Boulevard in Tampa. He argues that his convictions must be reversed because the evidence did not show that he was associated with an enterprise through a pattern of racketeering activity. He contends that at most the evidence showed that in connection with the fire, Noriega and Carter were acting independently of each other and independently of the "enterprise." Russello denies any knowledge of the existence of an enterprise as charged in this case. Furthermore, he argues that his two mail fraud convictions do not qualify as a pattern of racketeering activity because they arose out of a single mail fraud scheme and resulted in two separate convic-

tions only because two mailings happened to occur.

 We find the evidence sufficient to support the jury's verdicts. Russello's association with Noriega, initially, and then with Carter, supports the inference that he was associated with the enterprise. The enterprise was a group of people who shared the common goal of burning buildings and collecting fire insurance proceeds, and who worked together to achieve that goal. Certainly every member of the group was not involved in every transaction, but every transaction was part of the overall workings of the enterprise to which every member belonged. That Carter and Noriega acted independently in dealing with Russello does not mean that they were not working on behalf of the enterprise. The record reveals sufficient evidence from which the jury could infer that Russello's actions with members of the enterprise qualified as participating in the conduct of the affairs of the enterprise. As we stated in *Elliott*: "Under the statute, it is irrelevant that each defendant participated in the enterprise's affairs through different, even unrelated crimes, so long as we may reasonably infer that each crime was intended to further the enterprise's affairs." 571 F.2d at 902–03.

Russello proposes several other issues which have been raised unsuccessfully by his co-defendants. Russello's challenges of his RICO convictions are without merit. We affirm Russello's convictions on Counts 1 and 2.

 With respect to the mail fraud convictions, Russello insists that there is a fatal variance between the charge in the indictment and the evidence. Arguably there is some merit to this contention, but we do not find the variance of such substance as to warrant reversal. The indictment charges that Russello, Lazzara, Carter and Noriega devised a scheme to defraud the insurance company by filing a Proof of Loss stating they did not know who set the fire. The government offered evidence that the parties involved knew Noriega had set fire to the building. Testimony also indicated that the building's value listed on the claim was inflated. Russello argues that he was convicted of mail fraud on the latter basis, one not specifically charged in the indictment, and his conviction should be reversed. We disagree. We are not persuaded that the convictions were based on misrepresentation as to value. The reference to value in the testimony of a government witness was almost an aside. Russello offered experts who contradicted the government's suggestion of value. On the other hand the evidence abounds that Carter and Russello falsely denied knowing who set the fire. Russello's convictions on Counts 28 and 29 are affirmed.

### Conclusion

The convictions of SCIONTI, MARTINO, MORGADO, MACALUSO, HOLT, LAZZARA, RODRIGUEZ, RUSSELLO, FARINA, BROWN, YOUNG, PALERMO, and FISHER, as per the verdicts of the jury, are AFFIRMED.

The convictions of GUARINO on Counts 17 and 18 are REVERSED; his convictions on all other counts are AFFIRMED.

The conviction of CHASE is REVERSED.

The convictions of LOSTRACCO on Counts 1, 2, 17 and 18 are REVERSED.

### MOTION FOR NEW TRIAL

#### Docket Number 79–2606

Martino appeals from the denial of his post-conviction motion for a new trial based on newly discovered evidence. This evidence consisted of proffered testimony by co-defendant Guarino, who stated that he would have testified for Martino in a separate trial but that he did not want to testify in his own defense at the joint trial.

 The criteria for obtaining a new trial on the basis of newly discovered evidence are:

1. the evidence must be discovered following the trial;

2. facts must be alleged from which the court may infer diligence on the part of the movant to discover the new evidence;

3. the evidence must not be merely cumulative or impeaching;

4. the evidence must be material; and

5. the evidence must be such that a new trial would probably produce a new result.

*United States v. Rodriguez,* 437 F.2d 940 (5th Cir. 1971).

Guarino's proffered statements related to the burning of four buildings. Guarino stated he never discussed burning any of those buildings with Martino and that Martino was unaware of Guarino's interests in the N. Nebraska Avenue and Columbus Drive properties. He also stated that while Martino was aware of Guarino's interest in the warehouse transaction, Noriega's interest was not disclosed to Martino. Guarino denied having ever paid a kickback to Martino, specifically with respect to the Columbus Drive transaction. During his sentencing hearing, Guarino stated to the court that he made a mistake in not testifying during the trial because Martino, contrary to some of the evidence, "didn't have nothing to do with Nebraska or 12th Street."

■ Guarino's statements do not satisfy the criteria for the granting of a new trial. We need not decide whether newly available evidence is the same as newly discovered evidence because we find that the "new" evidence is not such that a second trial would probably produce a different result. Guarino's statements concerning Martino's lack of knowledge and involvement with respect to the N. Nebraska fire would not produce a new result because Martino was acquitted on charges relating to that fire. The 12th Street warehouse fire was not the subject of a substantive charge; testimony concerning that incident related only to Martino's association with the enterprise. Guarino's statement that Martino knew that he, Guarino, and not Noriega was involved would not be contrary to a jury finding that Martino was associated with the enterprise. It would suffice that Martino and Guarino worked together on the warehouse fire. With respect to the Columbus Drive arson, we find that testimony concerning nondisclosure of Guarino's interest in that property would not likely have changed the jury's verdict. Every member of the enterprise does not have to participate in every transaction engaged in by the enterprise. Furthermore, Guarino's denial of having paid a kickback to Martino for that property is not in direct contradiction to the testimony at trial; Noriega did not testify about a kickback, but rather that they bought out Martino's interest.

■ The decision to grant or deny a motion for new trial on the basis of newly discovered evidence rests in the sound discretion of the trial judge. We will reverse the denial of such a motion only where "it is shown that the ruling was so clearly erroneous as to constitute an abuse of discretion." *United States v. Antone,* 603 F.2d 566, 568 (5th Cir. 1979). That showing has not been made in this case.

The district court's denial of Martino's Motion for New Trial is AFFIRMED.

## FORFEITURE

Docket Number 78–3611